The first case this afternoon is case number 4-16-0891. Mark Marinelli, Appellant, v. City of Springfield Police Pension Fund Board of Trustees, Attorney Tom Raja, Appellant, v. City of Springfield Police Pension Board of Trustees This case is not about whether or not Officer Marinelli is disabled. We know that he is. The Pension Board acknowledges that he is disabled because he cannot fire his weapon as a result of the tingling and numbness in his fingers, which has been diagnosed as thoracic outlet syndrome by the physicians in this matter, preventing him from performing full and restricted duties. What the board denied the line of duty claim about was A, causation, and B, they indicated that this wasn't an act of duty that the officer was performing which resulted in his disability. We of course dispute that and we disputed that in the briefs. I think the facts are, as it relates to the disability, those are largely undisputed. However, the board does bring up some facts where they found that the officer was not credible. I'll be happy to address those in a minute. I think the more important point is whether or not the plaintiff adequately proved causation and whether or not he proved that this was an act of duty as defined by the case law under Article 3 to allow him to receive a line of duty disability. We submit that he met his burden of proof on both of those issues. The reason being, first I'll start with causation. The case law is very clear on causation. We don't have to prove that the work-related injury was the sole or primary cause of the injury. We just have to show that it was a causative factor in the condition. I cite the case law about that in my brief. We believe we've done that here based on the medical evidence that was provided to the board. We have approximately five medical opinions that were in front of the board that they analyzed in their decision and order. And in those opinions, all the physicians in some way, shape or form say that the writing of reports and the way that he had to write the reports in a squad car while on patrol, that that was at least in part a causative factor in this condition of thoracic outlet syndrome. Even the doctor, the one physician that the board relied upon in its decision and order, Dr. Mayra, and it's M-E-H-R-A, I'm probably butchering that pronunciation, but even that physician says the extensive writing of reports and the way he had to do it slouched in his squad car while on patrol, having to have a squad car and the makeup of the squad car, having his equipment on and that nature, that that was at least in part a causative factor in the condition. Of course, Dr. Mayra also says, well, it's his body hibiscus that was also a cause of the condition, meaning, you know, the makeup of his body. I had to look that up myself to see what that means. It really just means your body type. And, you know, you take the officers as you get them. So it certainly shouldn't be a black mark or a strike against him or a reason to deny causation because he had to write reports in a certain posture when he was doing that in his squad car. And there's a couple cases I cite in my brief which I think are instructive here and I think are significant and are right on point with the facts of this case. The two cases I think are most significant is Jones, which was decided by this court in 2008, and Alm, which was decided by the 2nd District Appellate Court. In Jones, there was an officer that was on routine patrol in his van that he was performing patrol duties on and he was in a car accident while doing patrol duties. He wasn't dispatched to a call. He wasn't on his way to an emergency call. He was doing routine patrol duties. And as a result of that car accident, he sustained orthopedic injuries and was disabled. There, you know, the court went through great analysis to the different cases that talked about active duty and causation. And they said exactly what I said earlier. He's proved at least in part that the patrol duties was a causative factor in the condition that rendered him disabled. And the fact that he was doing routine patrol duties, that was considered an active duty with respect to the case law. In that case, the defendants argued, well, he was just driving. Ordinary citizens in the ordinary walks of life, they drive all the time. Therefore, this can't be an active duty. The Jones court dispelled that argument and said, well, you know, patrol duties is unlike any other ordinary civilian occupation. They have to remain vigilant. You're looking out for crimes, things of that nature. Therefore, even routine patrol, when you're not actually dispatched to a call or performing it, it still would count as an active duty under the statutory guidelines with respect to Article 3, which adopted Article 5 of the Illinois Police Pension Code. You have a similar situation. Well, I'll talk about the second case. Alm is the other case that was analyzed by the Jones court. And in Alm, you had an officer that was performing bicycle patrol duties. There was no specific incident, no specific trauma that occurred while he was performing his bicycle patrol duties. It was just repetitive motion, wear and tear on his knee, and the officer there became disabled as a result of a knee injury. The Alm court, again, which is the Second District Appellate Court, there the Alm court said that this was an active duty because the officer had to wear his equipment while he was doing bike patrol. He had to remain vigilant while he was doing bike patrol over various terrain and sometimes at night. And that takes it out of what an ordinary citizen in the ordinary walks of life would do. Therefore, it qualified as an active duty. When you take the Jones case and the Alm case together, I think you have a very similar fact pattern here. Here, you had Officer Marinelli was performing the duties of writing reports in his squad car while on patrol duties. And all the physicians have indicated that the extensive report writing, the repetitive nature, that was at least some part of a causative factor. Counsel, did your client actually demonstrate that he engaged in extensive report writing? Yes, Justice. And how he did that was at the hearing before the administrative body, evidence was introduced as to the amount of reports that he had done at least for the two years and four months prior. Remember, he was on the job approximately eight and a half years. They didn't go back to his start date, but they at least analyzed the last two years and four months. And they found that he wrote a significant amount of reports. I'm just looking for the numbers here. I think in the last year and four months, it was 93 incident reports, 45 tickets, 15 crash reports. The year before, there was 137 narrative case reports, 100 traffic tickets, and that was in 2011. And he indicated that the problem seemed to come about when he had to do the longer reports. Is it fair to say that, I mean, the traffic tickets, they talked about those only being a page, and that he didn't write a lot of extensive, long reports? Well, his testimony before the board was, you know, he would experience at times cramping in his hands when he was writing reports. It wasn't real clear in his testimony whether it was while he was doing an extensive report or if it was a one-page report. He testified that while doing reports, he would on occasion experience cramping in his hands, but never really thought that that was significant. It wasn't until he was off work getting treatment for approximately seven months, and doctors said, hey, you know, the cause of this is from repetitive motion. If you're writing reports in your squad car the way you've told us, that certainly would be a cause of this condition. So, you know, that kind of goes to the credibility argument that the defense counsel makes. They say, well, the board didn't find him credible when he testified before them. When you review his testimony, I mean, I don't think he could have been more honest with the board. He said, hey, look, the first time I realized I have a real problem with my hands and fingers is when I'm driving home from my in-laws, and my hands went numb, and I was having issues, and my wife is asking me if I should pull over and maybe she should drive. He didn't say I was sitting in my squad car when I noticed it, and I was on duty at the exact time the symptoms started to really magnify themselves. He was honest with them. He said, hey, I was off duty at the time, and I didn't really know what the problem was. He was experiencing flu-like symptoms. He was dizzy. He was nauseated. I think there was a combination of some things going on with him at the time he realized his hands and fingers were the real issue. You know, the board, I think, had to hang their hat on something to deny him his line of duty disability. The case law doesn't support a denial, so they went to the credibility issue. And the credibility things that they raise in the board's decision really have very little to do with report writing and his patrol duties as why they're questioning his credibility. Even what they do question is suspect, at least in my opinion. They talk about, you know, he told someone he pulled out his gun several times, and on another occasion he said, I pull out my gun numerous times. To me, that's really semantics, and I don't see any inconsistency in those two statements. They talk about him doing text messages, that he would text a lot after he was diagnosed with this condition, and the fact that he could text somehow, and that didn't cause him significant problems, but that somehow was inconsistent with him applying for a disability pension. Well, in fact, the board asked at least two of the physicians that I see in the record, hey, would texting have an effect on his condition? And both doctors said no. And he even demonstrated for the board, here's how I text. I hold the phone like this. There's a picture in the record of him holding the phone, showing how he uses his thumbs, and even if he would experience pain or problems with respect to the text message, there was no evidence of it. He didn't testify he had any issues with texting. No physician said that texting would be a problem. So it's really a non-issue, but even if he would experience pain, that still wouldn't prevent him from, wouldn't allow him to perform the duties of squeezing a trigger, or holding a weapon, or holding a taser, or a baton, things you would need to do as part of your job as a police officer, which again, the board didn't find issue with whether or not he could perform the job. They said he can't perform the job. So this whole saying he's not credible because he was able to text message really doesn't go to any decision that they rendered in this case. It doesn't negate causation. It doesn't negate whether this was an act of duty, which are really the two things that they ultimately found as to why they denied the line of duty disability claim. Another inconsistency that they mentioned was losing weight. He didn't comply with his doctor's orders to lose weight when he was diagnosed with this condition. He testified before the board credibly that he did lose weight. He got down to about 185 pounds and he didn't notice any difference in his condition. So them finding that he didn't lose weight was not supported by the record or his testimony. He wasn't impeached on that issue or anything of that nature. So again, I think these credibility issues were nonexistent. I think they were more or less manufactured by the board in order to hang their head on something. As I mentioned, I don't think the case law supports their denial of the claim in this matter. I've indicated I think their decision against the manifest weight of the evidence when it comes to the causation issue because as I said, there was at least five reports, medical physician reports that said they're familiar with the demands of the job. They reviewed the job description of the police officer and they found that at least in part the duties of a police officer, his writing of extensive reports while on duty was a causative factor. In reliance upon the Jones v. Bloomington case, he was on routine patrol. I think you have an additional factor here that he was writing reports while on patrol, which was the causative factor in the condition. We don't have a specific traumatic event, but as the Alm case says, you don't need a specific traumatic event. It's were you injured or disabled as a result of performance of an active duty. We've adequately proven that he was performing his duties. Even the job description itself indicates that he has to write reports as part of his job duties. He has to use a pen and paper as part of his job duties. He has to be on patrol in a squad car and I'm citing for the job description previously page 1 through 3 of the record. The job description requires he aggressively patrols as a signed beat. He prepares written reports, completed in concise manner in performance with department policy. So he was doing his job on a Unfortunately, he gets this condition, you know, he tried everything he could do to come back to work. This is an officer that said, hey, I've been diagnosed with something, I'm punching my ticket and I'm out of here. He had a surgery, a carpal tunnel surgery in June of 2013 to try to correct the condition and come back to work. He then had a pectoral release surgery in April of 2014 to try to correct the condition and come back to work. Unfortunately, neither of those surgeries worked and he had to apply for a disability pension. Again, based on all that, we ask that this court, you know, looking at the medical evidence, find that the board's denial on causation was against the manifest weight of the evidence, that the plaintiff adequately proved this was an act of duty that he was involved in that resulted in a disabling condition and reverse the decision of the board and grant him a line of duty disability pension. Unless there's any questions I can answer from the bench, I'd reserve the rest of my time. Thank you, counsel. Thank you. Mr. Baldwin. May it please the court, counsel. I'm glad counsel brought up the standard of review. Both parties agree that the standard of review would be the standard of review enunciated in the Marconi versus the Chicago Heights Police Pension Board case, and that is whether the plaintiff is in favor of the standard of review. The question is whether the board's decision is against the manifest weight of the evidence, or whether the board's decision is against the manifest weight of the evidence. Excuse me on that point. But if that's the standard of review here, then it's a very high threshold. The board has to be given the standard of review. The board has to be given a significant amount of deference on what happened at the administrative hearing level. So even if the opposite conclusion is reasonable, or even if there's, you know, the court might have ruled differently, that does not justify a reversal of the administrative agency's decision. Regardless of the standard of review, the plaintiff still has the burden of proof here that he's entitled to a duty-related disability benefit. And if the evidence does not show that, and he hasn't met his burden, then relief has to be denied. Now, just like in the Marconi case, the board here was justified in denying the disability-related pension because of all the contradictions, all the conflicting evidence that was at the board's disposal. Some of this, let's start with what the primary cause was as presented by the plaintiff. In his opening statement, the plaintiff's counsel said the evidence is going to show that it was report writing that caused his symptoms. During the hearing, the plaintiff testified to that fact as well. But when you look at, then, the evidence to support that position, there's too many contradictions. For example, the board presented objective evidence of the number of reports that he wrote for 2011 through 2013. We also had Mr. Marinelli's testimony at the hearing. All of this contradicted with what the physician said in their medical reports. So initially, I'd like to, as background information, tell you that Mr. Marinelli wrote his reports longhand. He didn't use a computer in his patrol car. And in fact, during the hearing, there was no evidence of the extent or the frequency of Mr. Marinelli's use of the patrol car computer. So we introduced exhibits that showed the number of reports he wrote during this period of time. And basically, there was no dispute by the plaintiff about the number of reports he wrote. So over a 15-month period, he wrote 15 traffic tickets. He wrote 45 crash reports. He wrote 93 incident reports. By his own testimony, the crash reports, traffic tickets, they're one page each. The incident reports are two to three pages each. So there was no other testimony by the plaintiff who had the opportunity to bring in evidence of lengthy reports. There was nothing in there about no evidence presented about anything besides what the board produced as exhibits. So in their appellate brief, they basically contend, well, he wrote 14 reports a month. Well, that's not far from what we contend either. But if you take that and break it down even further by pages, by their own admission, it's 20 pages a month. That's less than a page per workday. So the board thought, this is not extensive. This is not repetitive. This is using common sense. But then, during the hearing, Mr. Marinelli, on direct examination, says, when asked, well, what did the doctor say about this? He says, I never raised report writing with my doctors. I never told them anything about that. And then on cross-exam, he said, I never told them the number of reports I wrote. So there's a disconnect right here between his testimony, the objective evidence, and then what the doctor said in their reports. And as an example, Dr. Thompson basically said it was writing lengthy reports while in his patrol car that caused his condition. One of our doctors, it was one of our doctors admittedly, basically said, oh, it was typing on his computer and typing reports on his computer in the patrol car. But he didn't type reports. He wrote them longhand. So right there was a disconnect between many of the doctor's reports and his testimony and the objective evidence. There were other discrepancies, too. Dr. Mira, and by the way, it was Dr. Warrick who basically said that his body habitus predisposed, not Dr. Mira. But the fact is that there were other discrepancies. Particularly, Dr. Mira said, oh, he says it's apprehending suspects. And Dr. DeBoer said the same thing. They both said, oh, it's also extensive use of firearms. But by his own testimony, he was only in two encounters during his entire career as a police officer of apprehending suspects. Once in 2006, once in 2008. As far as firearm use, he had to go to the range once a year. He admits that. As far as drawing his weapon, he said first, oh, well, several times. Then he said numerous times. And if you read the transcript, some of the police officers found that incredulous. Rick Dayball, president of the board, said, I drew my gun every day. I get into circumstances where I draw my gun every day. So if you take that testimony, and then after April 23, 2014, he testified, he never even used a gun. So you have all these, again, inconsistencies between what the doctors drove and what he testified to. There were also, when he talked about onset of symptoms, there were inconsistencies between the onset of symptoms in the medical records and how he testified. For example, he first went, there were three doctor's visits, medical providers that he saw within an 11-day period. And one was April 30th at Memorial Express Care. He also went to see a chiropractor the next day at Springfield Clinic. And then on May 11th, he went to a neurologist with Springfield Clinic. When he's at Memorial Express Care, he says, I've had this condition for the last three days. That's April 27th. When he goes to Dr. Valenti, he says, I've had this for the last six days. When he goes to Dr. Narla, he says, I've had this for the last 10 days. Well, that's April 24th, that's April 27th, and that's May 1st. And then he goes to Dr. Wadawa in June of 2013 and says, this happened on April 28th, 2013 when I was driving home. That's a fourth date. So the board looked at all this, and if you look at the transcript, the board had a lot of questions for Mr. Marinelli. But one of them was from a trustee named Bill McCarty, who basically said, I can't figure this out. You say it's this date, it's that date. It was this, it was that. So the board had significant questions about the evidence, about the doctor's reports, and it didn't add up to them. So then we go to the next. He alluded to the fact that there were some questions about his compliance with physician's directives. And the specific facts are that Dr. McKinnon, who he saw was a physician at Barnes Hospital in St. Louis, said on an initial plan, you need to get into a weight loss program, you need to do physical therapy. You need to do physical therapy once a week for six weeks. Well, he didn't go into a weight loss program. And second, he went to two of six physical therapy sessions. Dr. Thompson, another physician from Barnes Hospital, said, we need to put you in physical therapy. You'll do it once a week for 12 weeks. He went four out of 12 sessions. As far as the texting, the significance of that is that Dr. Thompson himself wrote a light-duty report, or excuse me, a light-duty order, to the Springfield Police Department, telling them, yeah, he can work a desk job, but no repetitive use of his hands. But then at the same time, he's texting outgoing texts on his phone. We had records from AT&T, he did not dispute these, in which he's texting 370 times a month. In one month, he texted 700 text messages, outgoing text messages. To the board, this was a common-sense thing. We didn't need any medical opinion to say, you can read the transcript and see all the questions that the board had about this. So with that, we think that the applicable case is the Marconi case, because in that case, there were conflicting pieces of evidence. There was only one psychologist who said he's not disabled. The other three psychiatrists said he was. The board adopted the psychologist's opinion that he was not disabled. And similarly here, we adopted Dr. Warf's opinion that basically said, well, I think it's more that his body type is the more likely candidate for his TOS, his thoracic outlet syndrome, than anything else. That's the only thing the board could do, considering all the evidence that was before it. And like Marconi, the Supreme Court basically said, look, the board was faced with a bunch of conflicting facts here. It is their function as trier and binders of fact to determine the weight of the evidence. And in this case, that's what the board did. They wrote a nine-page decision with findings of fact, conclusions of law, and they basically set forth the reasons why they gave him a non-duty benefit and denied him a duty-related disability benefit. So we think that case is controlling in our case. And just as the Supreme Court did with that case, we would respectfully ask that this court affirm the denial of the duty-related disability benefit to Mr. Marinelli. Now finally, in their brief, they raised the issue of an aggravation of a pre-existing condition. And that was not presented in the administrative hearing. It was not put in his application. As I said before, in counsel's opening statement at the administrative hearing, he said, the evidence is going to show this is caused by report writing. And again, Mr. Marinelli testified to that as well. There was no evidence. There was no notice. There was nothing that gave the board some type of indication that they were going to claim a pre-existing condition. And we all know it's black-letter law, that if you don't address it at the administrative hearing, then it's waived on review. So with all that said, we would respectfully request that this court uphold the denial of Mr. Marinelli's on-duty disability benefit. Thank you, and I would be happy to answer any questions. I don't see any questions. Thank you. Thank you. Mr. Raja, rebuttal argument? Thank you for letting me rebut some of the statements that have been made. I'll start in reverse order. Counsel brought up that the plaintiff has waived an argument here by not raising it at the administrative level. Well, the plaintiff did. We argued that the report writing was a causative factor, was a cause of his disability. The plaintiff's burden of proof doesn't include instructing the pension board on what the appropriate law to apply is. The case law is very clear. I cite to it in my brief. The case is SHUPEC, S-C-E-U-P-U-R-E-K, versus the Northbrook Firefighters Pension Fund. And that says that disability may result from multiple causes. In order to obtain a land-duty pension, the plaintiff must prove the work is a causative factor contributing to the claimant's disability. But don't you think that's a little bit different than a claim of aggravating a pre-existing condition? I believe it's the same standard, Your Honor. When you read the cases here that they cite to, it doesn't have to be the sole or primary cause, just a causative factor. So if the job is aggravated in an underlying condition, well that's a causative factor. I don't think it's the plaintiff's burden to have to establish, well here's our theory of the case on causation for the board. The case law is exactly that. It says here's what causation means. It means causative factor, aggravation of an underlying condition. All that is included as part of causation. I think it's a legal determination that the board had to appropriately apply. It's not a burden of proof that the plaintiff has to set forth. The plaintiff argued that his report was a causative factor in his condition. I think we've demonstrated that. So whether it aggravated some underlying condition that was already there or it was a causative factor in rendering him disabled, which I think is the standard that applies, they're both present here. And the board doesn't cite to any case law or any medical evidence that says otherwise. And you heard a lot from opposing counsel here as to why they denied it, but you don't hear them rely upon any medical evidence to deny the condition. Other than Dr. Warrick who said, yeah, his body habescias was part of the cause, but Dr. Warrick also said that his extensive report writing was part of the cause. So if you're going to adopt one doctor's opinion in order to deny the claim, I think you have to look at that opinion in its totality. So you were taking then the position that it was potentially the aggravation of a prior existing condition? To me, it's a distinction without a difference, Justice. Aggravation of a pre-existing condition or a causative factor in disability, I think it's the exact same thing worded a different way. If the job duties aggravated the underlying condition, well then the job duties are a causative factor in the disability. And I think it was the board's duty to apply the appropriate legal standard when it decided causation, which according to counsel, they didn't do. Dr. Warrick, who they relied upon, said Martinelli's body type and his work doing extensive report writing is what predisposed him to this TOS. So he says it's both. They just chose to ignore that portion of the doctor's opinion. And I cited case law that says unrebutted testimony or evidence just can't be ignored by the administrative agency when they render their decision. And that's what they did here. As far as the standard of review, I think I cited in my brief that after examining the entire record, if this court feels that the evidence favors one party, the party who did not prevail, that it's the duty to reverse. I think that's the case here. Again, Dr. DeBoard said it was report writing in an awkward position that prevented him from doing his work as a police officer. Dr. Thompson opined that it was the long periods of writing in an awkward position that was part of the disability. Dr. Warren indicated that writing up his report on the steering wheel was a causative factor in the disability. Dr. Mayra said his disability resulted from repetitive hand movements. And as I mentioned, Dr. Warrick said it's work doing extensive writing. So if there's not one medical opinion that said, hey, his work as a police officer had absolutely nothing to do with the diagnosed condition that led to the disability, they don't have that here like in Marconi. As counsel indicated, Marconi, they had a psychiatrist that they relied upon that said his job had nothing to do with the disability. And that's why they came to the court. Dr. DeBoard there said, yeah, DeBoard was justified in their reliance upon some competent evidence in the record. You don't have that here. The dates of onset of symptoms, my client was absolutely forthright with DeBoard saying he didn't know that this would be disabling, first of all, or he knew that the onset of the symptoms, when it became so severe, it was that day when he was driving home from his in-laws on April 28th of 2013. That's when in his mind he knew that he had a real problem. I'm sorry, but you've run out of time. Okay. I'll just wrap it up then. Just one minute to conclude here. The doctor's reports were a little bit inconsistent, but my client's testimony wasn't inconsistent. The reports that said when the onset of symptoms, they were talking about a lot of symptoms. They were talking about this dizziness he was having, the flu-like symptoms he was having when they were questioning about when the onset of those symptoms were. And DeBoard wasn't specific in their questions when they asked them about the onset of symptoms. So, again, I think that's a red herring as far as inconsistencies that are presented to DeBoard, because he was very consistent about the symptoms of thoracic outlet syndrome. I thank you for your time. I would ask that this board reverse the decision of the pension fund and find that my client has sustained a line-of-duty disability. Thank you very much. Thank you, counsel. The case will be taken under advisement and a written decision shall issue.